Good morning, and may it please the Court. It's indisputable that the text of the Video Privacy Protection Act intended, from objectively looking at the text, intended to protect consumers not just of video materials but also of services, not just videotapes but services from videotape service providers. It says so explicitly in the definition of consumer, and it says so explicitly in the definition of personal identifying information. We maintain that because that purpose is evident in the, from the text of the statute, that when it comes to interpreting the definition of videotape service provider, the best interpretation of that definition in context includes not just providers of materials but service providers, providers of services. Yet the district court below interpreted that clause as not including businesses that don't transfer a possessory interest, in other words, businesses that don't sell a good or rent a good or deliver a good. It doesn't include providers of services. And we think that that interpretation of the statute is unreasonable and it doesn't fit with the context of the statute as a whole. But in the main provision, the one that we're really trying to, you know, interpret, it talks about it being any person, and then it goes on, rental, sale or delivery of pre-recorded videocassette tapes or similar audiovisual materials. That definitional provision doesn't include the service part of it. I know other provisions do, but that key definition does not. So what do you make of that? So we believe that the definition of service provider, because that's the term being defined, there's no particular reason for the definition to itself include the term services. It's explaining what type of services are being covered, and the type of services that are being covered are the sale, rental and delivery of audiovisual materials. Now, the delivery of audiovisual materials, the materials there doesn't mean physical material. It means like audiovisual work or audiovisual content. Materials is often used that way in statutes. We cite, we think most prominently, because it has all the terms involved, the ADA, which describes regulation of statutes regarding what orally delivered materials, visually delivered materials, and everyone agrees that that's referring, that includes movie theaters showing movies because it says so in the statute that that's included. Well, let me press you on that because, you know, although, you know, I'm not a big fan of statutory history. I don't think you need to get there here. But videotape service provider, I think they're talking about Blockbuster. I think that's what, I mean, that was what motivated the statute. And so when you go to, and it uses the word similar, audiovisual materials, when you go to Blockbuster, which doesn't exist except for I think in one state now, there might be one remaining store, you go and you pull the tape off there, you go to the front counter, you check out, and you have it for two or three days. I guess the equivalent for a movie theater would be they're showing the reels of the video. And the equivalent would be if you could go outside after the movie shows and buy the reel and take it home with you. That's sort of the equivalent of Blockbuster. And so I'm wondering why that's not the most natural interpretation of the statute. You could buy the reel. You could rent the reel. You could, what is the other, sell the reel. But none of these movie theaters do that. Movie theaters at most show the trailer on the website. So, Your Honor, I think there's two reasons why that's not the most natural reading. One, if that's what the statute intended, there would be no reason to put services in the definition of consumer and the definition of personally identifiable information, because what Your Honor is describing is a regular video store that just hands you the actual video. They don't provide services. But the intent of the statute was much broader. They wanted to protect records. And that's, it's really clear throughout the legislative history, and I don't think we need to get to it either, but if one does look at it, it's very clear that its intent was to protect the privacy of records. So the first reason, I think, is that the statute is clearly broader in intent than just a video store. I also think that it's the case that video stores, and we have to put ourselves back into 1988, very often had other services that they provided beyond just handing you a video. It was common, video stores used to have a section, some upper-class video stores would have a section in the back where people can go and view obscene videos. There would be like sort of an adult section, a peep show, if you will, was a common thing. There was, there's some case law about video stores that, copyright case law about video stores that would actually, you could go in the back and get a private room to watch the movie in it, in the video store. So I think video stores had additional services beyond just the standard we were all most familiar with. But like I said, it goes by what the statute was trying to do, and the statute was clearly intended to go beyond that and cover services. And there is no doubt that a movie theater provides a service of showing films. That is what it does. And we think that the most reasonable way to interpret this clause so that it doesn't, it isn't contradicting its own term that it's other provisions in the statute is that it includes providing services such as showing movies. Now, counsel, you're right to focus on privacy, but I bet you know this better than I do, but I'll give you the $40,000 and you can supply details. But we had the Privacy Act of 74. Until then, government records were kind of considered public, period. They were until the Privacy Act of 94. And then, of course, you had the one that applied to cable TV, that they couldn't tell what you were viewing. And then this was about four years or so after the cable bill. And then we've had later privacy, as you mentioned. We've had later, and it seems to me that Congress is taking an incremental approach on privacy. And during this period of time, the movie theaters were everything. They were everything on movies. You get my point. I won't belabor it one bit, especially in 74 and the other dates I've talked about. So why wasn't we, why shouldn't we interpret this, in particular the word similar here, as being the things that were like that incremental approach, and it was the stores they were talking about, of course, at the time, we know. So why doesn't that 40,000-foot view reflect what Congress was thinking with this law? Thank you, Your Honor, for that question. The legislative history makes very clear that this is, you know, following in a part, you know, after an incremental protection of records, not of particular actions of people, but records. They're viewing records. And that's what the Cable Act was. And that's what sort of the, there was a commission that was created out of the Privacy Act that also said any information that somebody gives for one purpose should be protected and not be used for any other purpose, you know, personal information. And at the time, movie theaters didn't collect personal records. We, we, nowadays, we have. Counsel, they've had, we're probably outside the records, so this is bad. But movies have always had ways that you could buy a ticket for the whole year and for this and for that and different seating. And some have reserved, in the big cities, some have reserved seating for movies and for showing. So I'm not sure you're quite correct about they didn't have records of who saw what movies. I'm not saying it never occurred. I'm saying it wasn't the ordinary course, right? And so in, in the ordinary course, movie theaters weren't collecting records, but video stores definitely were. And that's, I think, this fact, this is reflected in the legislative history. And I know, again, I don't think we need to go to legislative history, but if we do look at the legislative history about this incremental improvement of privacy protections, the library portion, they also added libraries originally to the statute, but they didn't include bookstores. Now, bookstores and libraries have the same level of privacy in the sense of not being in public, you know, same level of publicness. You go to the store, you pick it out, or you go to the library and you pick it out, and you take it home to read it. But bookstores weren't included, not because no bookstores ever kept records. Some bookstores, I'm sure, had, you know, people who were subscribers to, you know, book of the month clubs and the like. But that wasn't the norm. The norm was libraries kept records and videotape stores, videotape stores kept records. So that was the focus of the statute. But they also understood that technology was increasing, and it's also reflected in legislative history in terms of the records that are held by companies. And so they didn't limit this to just videotape stores or just libraries in the first instance. They said, we're going to protect anything that's similar, anything that's like this. Records of what you watch, of audiovisual materials of what you watch, that's what we're protecting. And so we believe that that, that the movie theaters fit perfectly into that language and also fit into the legislative history and the intent of Congress. I take it you think that, and I know this isn't your client, but streaming services, I mean, you kind of get at this with the trailers, but the streaming services like Amazon Prime and Netflix, it would be your opinion that they would be covered under your interpretation as well? Yes, Your Honor. And many, a number of courts have held that, a number of circuit courts have held that. Salazar recently held that. There was Gardner, the case we attached. Salazar, I mean, the Second Circuit Salazar case. How many circuits, counsel, is the streaming being covered by? We have the first, the first, the second, and the seventh have all held that streaming as far as off the top of my head. Where's ninth on that? I thought ninth was there too. The ninth O-S-H-E-K-E case? Go ahead. The Oshetski case is the case that they're going to be citing here, which is the case that held the movie theaters are not included. It did imply, without saying so, that streaming services may be included, but it didn't want to reach that decision. Thank you. Well, and streaming services are a little different. I mean, it depends on what our ultimate interpretation is. But there, you know, like on Amazon Prime, you can pay like $5 and you can, or $20, you could pay $20 and you could buy the movie or you can pay $4.99 a night and rent the movie. There, it more cleanly fits into the language than perhaps this does. If you were to make the argument this is like a streaming service, what would your argument be? And maybe you're not making that argument. So we do think there's an aspect here that is like a streaming service, which is the movie trailers that are shown on the website. So the way that they set up their business is you go to their website, you watch the trailer, you get excited about the movie, you click to purchase a ticket. In this case, our client, you know, watched a movie trailer, then left the website, and then when she was on Facebook, Facebook shows her advertisements for the movie because they're tracking what trailer she watched. So then she goes back to the streaming services, except that it's very short little videos as opposed to longer videos. But it is the same issue of delivering it over the Internet and watching a video in that sense. Counsel, in addition to delivering it, they have to be in the business of. Is merely placing trailers on a website sufficient for them to be in the business of delivering audiovisual materials? Yes, because it's an integral part of their business. Advertising movies is the way you do it, the way you advertise movies. The primary way, nowadays at least, is through movie trailers. That's how people decide which movies they want to see, and that's how you get people to come into your theaters. But they're seeing those in the theater. They're not selling the trailers. Yes, but advertising is an integral part of business. I don't think anyone in business would tell you that in businesses that use advertising that advertising is just something that's peripheral or ancillary. Advertising is an integral part of every business. But the delivery comes at the theater, not online, doesn't it? Well, they deliver the advertisements online, and then they deliver the movies in the theater. In that vein, is McDonald's in the business of advertising their Happy Meals on TV, or are they in the business of selling Happy Meals and hamburgers and things like that? What would we say they're in the business of doing? I think that it's very likely that they're in the business of both. If you'd ask Ray Kroc, and he's not here, but I think he'd say advertising was a very large part of what turned a small neighborhood hamburger joint into a worldwide phenomenon. Coke is not just in the business of selling drinks. They wouldn't be what they are if that's all they did. They're in the business of advertising really, really well, and so people take a drink there and buy their products. Counselor, you're going to do a rebuttal, as you know. Yes. You may reserve. Mr. Griswold. May it please the Court. My name is Joel Griswold, and I represent the movie theater in this case, Cinema Entertainment Corporation. This appeal presents an issue of statutory interpretation, and it begins and ends with very clear language of the statute. Specifically, this appeal is about only one narrow and straightforward issue, and that is whether a movie theater is a videotaped service provider as expressly defined under the Video Privacy Protection Act. At the end of March, the Court of Appeals for the Ninth Circuit considered this very narrow issue and held that movie theaters are not videotaped service providers under the VPPA, and so doing, the Court issued a deft five-page opinion articulating why the text, structure, and purpose of the statute dictate that movie theaters are not videotaped service providers. We think that the Ninth Circuit case in Oshetsky was correct. We think that the district court got it right here, and we'd ask that this panel affirm. This is a gateway issue. As you'll notice, Appellant's Counsel jumped right to definitions of consumer and private and PII under the Act, but both consumer and PII are defined contingent upon interactions with videotaped service providers. Neither definition makes sense unless you first understand what a videotaped service provider is. That is why that definition is a gateway issue and the one before this Court. The term videotaped service provider means, quote, any person engaged in a business in or affecting interstate or foreign commerce of rental, sale, or delivery of pre-recorded videocassette tapes or similar audiovisual materials. The sequence rental, sale, or delivery of pre-recorded videocassette tapes or similar audiovisual materials. Given the structure, the statute covers businesses that rent, sell, deliver pre-recorded cassette tapes and businesses that rent, sell, or deliver materials similar to pre-recorded videotape, videocassette tapes. What about, what would your viewpoint of Netflix, Amazon Prime, Apple TV, all those streaming services be? Are they covered or not covered? Judge Strauss, you know, it's an interesting question. It's not something that's presently before the Court, and I know it wasn't something that was actually even decided by Gardner or Salazar yet in terms of whether those are actually videotaped service providers. Both in Gardner and Salazar, the courts, the Second and Seventh Districts, they don't cover consumers by virtue of interacting with those companies as a subscriber or someone other than someone who is consuming video material from the company. I can tell you that digital streaming, I think, follows along the lines of, when you talk about materials, as you see from the briefing, Appellant focused much on audiovisual. Material, I think, is qualified by audiovisual and also something that's similar to videocassette tapes. I think that the reason that Congress left open the issue of other similar materials is because they contemplated that there could be in the future additional medium or apparatus for transmitting video, and that's proven to be very, you know, pressing on their point. We saw Beta give way to VHS, VHS give way to DVD, and then DVD to Blu-ray, and I stopped counting after that because then we went to, you know, digital streaming, Amazon, Netflix, as you mentioned. Digital transmission could be the next apparatus, possibly. I don't know, and we haven't seen anyone weigh in on that yet. The reason why I ask is because there are some streaming services that look a lot more like Blockbuster Video, like Amazon Prime, and there's some that don't look like Blockbuster at all. Like, I don't know, Netflix, to my knowledge, doesn't have like a, where you can, I mean, you can pay extra for a better level of service, but you don't pay extra for individual titles, which looks less like Blockbuster. But as Judge Benton mentioned, you know, there were situations where there were subscriber models at movie theaters, which looked a lot like Netflix. So we're kind of an undiscovered country. I'm just trying to figure out where this exactly fits. You know, it's an interesting question, Your Honor. I would say that one thing that's a little different than, and I think is somewhat instructive, is when you look at the, what the words, the words involved here are, you know, sale, rent, deliver. They all, in their normal definitions, involve the transfer of possession of something, right? And when you're talking about streaming services, for instance, you are talking about transferring at least control over what you're watching, when you're watching it, where you're watching it, how you're watching it. You could do it in your home. You could do it on a plane. You can pause it. For instance, if you don't have the luxury, when you go to a movie theater, trust me, you know, as I've missed many movies, it's very different. It's a very different experience when you don't have control over it. The briefing you'll see appellant focused on, well, watching a movie in a theater is akin to renting or selling. Well, first of all, you know, you don't rent movies in a movie theater. You buy tickets to go watch a movie in the theater. You buy tickets, you get a license to go sit and watch a movie that's showing whether you're there or not. You can't leave with it. You can't control it. You don't have any of the possessory interests that you see with DVDs, with VHS tapes, and possibly with streaming that you rent or purchase through Amazon or another streaming service. It's just a very different experience, and it's a communal experience. I mean, I think the Oshetsky court mentioned that it's just a very different experience than what you see when you're renting or purchasing a video. In fact, the complaint doesn't even allege the plaintiff obtained from Cinema any videocassette tape or similar item. It only alleges that she purchased movie tickets on Cinema's website and watched trailers. Suppose they did. Suppose they had a little table outside where they said, you just saw a wonderful movie. You know, here's a videotape, DVD, Blu-ray, whatever, for $25 that will allow you to take it home with you. Would that change the analysis? I think it would, Your Honor. I think that if you were actually given the movie and a record of that movie was transmitted to somebody else without proper consent, then I think that we're talking about something entirely different. But just having a license to enter a premises and watch a movie that's showing is not the type of rental sale that you've seen is part of the definition for VTSP. In terms of the advertising question that I believe you asked, Judge Graz, I mean, I think it's very telling that essentially Pound believes that anyone who uses video as a means of advertising is a videotape service provider under the VPPA. That is definitely not consistent with the language of the statute or the legislative history or purpose of the statute. In fact, even considering movie theaters as potentially videotape service providers under the framework of this statute is essentially trying to hide an elephant in a keyhole. That's not something that we presume Congress tried to do. Movie theaters, as you pointed out, Judge Benton, were the thing in 1988. Home media was a very minimal part of our entertainment experience. You went to a movie with your family, you watched it, and it was just a very different experience. You watch it in a place of public accommodation, and Congress knew how to regulate movie theaters. They did it before the passage of the VPPA, and they've done it since. In the 1964 Civil Rights Act, they defined movie theaters as a place of public accommodation that's covered. Two years after the passage of the VPPA and the ADA, the American Citizens Act, they again defined a place of public accommodation as including movie theaters. Copyright laws have defined movie theaters or motion picture houses. When Congress wants to regulate this massive industry, this elephant, they know how to and they have. They chose not to do it here. And, you know, I think it's telling that the statute was passed in 1988, and you've seen a flood of VPPA. Well, I represented a large brick-and-mortar chain, you know, 15 years ago, and I thought I would never see this again. And then the statute took us, you know, it took a rest for about 10 years, and then you saw it start going into different streaming services primarily, and different theories of how you might be able to bring a claim under this statute. It's interesting, I think it's telling, that as active as VPPA litigation has been over the last two to three years especially, in 37 years, no one's really gone after movie theaters, because I think it's so obvious they were meant to be excluded. All these lawsuits have gone after the types of media that can be viewed and controlled by the user in the privacy of their own home. And that was really what Congress had in mind when they passed the VPPA. That's why they mentioned the sanctity of what you do in your own home and something you do on your own, not the communal experience of watching a movie with others where you're out in the open, and any member of the public who's there in that place of public accommodation can see what you're watching. The VPPA also doesn't regulate the time and place of anything. Let's say a brick and mortar, let's say a blockbuster in Washington, I think that's where it is, there's one around. Let's say that they decide they want to disclose a list of people who came into the blockbuster. The VPPA doesn't prohibit them from disclosing who came in or what time they came in. But if you applied that to a movie theater, it's very clear when movies are playing and at what location, and you can get a pretty good idea of what somebody was watching when they show up at that time and location. As a practical matter, drive by a marquee for a movie theater. It doesn't say renting now or selling now. It says showing now. We're showing it. We're showing these movies. Well, that's sure what the streaming industry does, too. I thought in Oshetsky that the Ninth Circuit alluded to the fact that streaming was covered. Now, I'm glancing at it here on the bench, and of course, you're very familiar with the case. So if you would, does it say, as I thought it said, that streaming is probably covered by the Act? Actually, it really didn't. I think it left the issue open, Your Honor. Yes, but does it mention it? I've got the opinion, too. It does. Let me actually try to get to you. Okay, good. Well, if it's any trouble, don't. But you're confirming what I tried to remember. If they did imply and infer that streaming was covered. I know there is a footnote, Your Honor, where they say other decisions by our court have left open the possibility. This is footnote three. I see it, but it's more open than I thought, even though it obviously mentions Netflix. Okay. Proceed with your argument. Sorry. So they've left an open issue because it hasn't really been decided yet. Sorry, Your Honor. No, I thought the opposite was true. Go ahead. I know about the other circuits. And I would say, you know, appellant argued that, well, it somehow renders redundant or unnecessary or the word services from, you know, that period elsewhere in the statute. Well, it doesn't, because the VPPA, if you almost, I envision like a funnel almost standing with the narrow point at the top. First, you have to decide whether somebody is a videotape service provider under this very, I think, narrow definition. If they are a videotape service provider, then we know that they're regulated under the act, okay? So then their interactions with consumers become subject to certain restrictions on what they can or can't do. For instance, they won't be able to, without notice and consent, provide someone's PII to a third party, right? And that PII is defined to include not only just the purchase of goods, but also of services. To illustrate the point, if a videotape service provider like a blockbuster or a brick-and-mortar place would not only rent movies, but they may also, for instance, have a waiting list that you can put on for movies that aren't in yet. Because you'd stop and check, I know my movie theater, my rental chain did it. I went in there, I told them I didn't have it, checked the job box, not in there, kind of get on the wait list and get a call. That kind of requesting information about movies is something that's also protected under the VPPA, okay? So it doesn't render obsolete the inclusion of term services because videotape service providers like brick-and-mortar chains did offer things other than just rental. They kept other records of people making inquiries about movies. They may have reward programs where people can come and get points and they can get, you know, discounts off candy and things like that. So it doesn't render any of that obsolete. Of course, it does drive closer to what movie theaters do because most movie theater programs also have loyalty programs as well. But the difference being that we have to look at what the nature of the business is, right? And the nature of the business isn't to rent, there's no rental or sale of, you know, videocassettes, videotapes or similar audiovisual materials at movie theaters. I see my time is up. Thank you for your time. Okay. Thank you for the argument, counsel. Mr. Huffman. Thank you, Your Honor. I think this case fundamentally comes down to are we going to take a narrow interpretation of a clause and interpret inconsistent with the context, or are we going to take a broader interpretation consistent with the context? And I don't see, I just didn't hear from the other side any reason why we ought to take the more narrow version. We can take a definition, all the terms, sale, one sells services all the time. That's an ordinary course term when it comes to services. Deliver is an ordinary course term when it comes to services. Audiovisual materials, we cited a whole bunch of examples of statutes that use the term, or government communications that use the term where it's referring to the content, not referring to the actual physical medium. So why would we take this narrow view inconsistent with the term service provider and with the people that it's trying to protect, consumers of services, and the information it's trying to protect, the request of services? Additionally, they've come up with this construct of videotape service provider being the narrow gateway definition at the top and everything else being broader once you get in the door. And there's no indication in the statute whatsoever that that was the intent. And I think in the legislative history, and again, it's not necessary, I think, to resolve this, but the legislative history makes clear that the opposite is true, that videotape service provider was the broader category, and it was things that the definition of personally identifiable information, and I'm looking in particular in the appendix at page 212, where the inclusion of videos within the definition of personally identifiable information was that simply because a business is engaged in the sale of rental of video materials or services does not mean that all of its products or services are within the scope of the bill. So they deliberately created a more narrow definition of personally material information, which includes services, so that you wouldn't, by mistake, confuse the broader definition of videotape service provider.